WALTER J. ROTHSCHILD, Judge.
IgThe Jefferson Parish District Attorney filed a bill of information charging defendant, Brittany Rogers, with three counts of armed robbery in violation of LSA-R.S. 14:64 (counts one, two, and three) and one count of second degree kidnapping in violation of LSA-R.S. 14:44.1 (count four).[1] Defendant pled not guilty to these charges at her arraignment. Defendant subsequently filed motions to suppress that were denied by the trial court.
Thereafter, defendant withdrew her not guilty pleas, and after being advised of her rights, pled guilty to all counts pursuant to State v. Crosby,[2] reserving her right to appeal the suppression rulings. For the three counts of armed robbery, the trial court sentenced defendant to 20 years imprisonment at hard labor, without benefit *490 of parole, probation, or suspension of sentence for each count. For count four, second degree kidnapping, the trial court sentenced defendant to 20 years imprisonment at hard labor, with the first two years of the sentence being without benefit of parole, probation, or suspension of sentence. All of these sentences were ordered to run concurrently with each other. This timely appeal follows.

\ .FACTS

The bill of information and the guilty plea colloquy indicate that on January 1, 2008, defendant committed armed robbery of Lorrie Fisher.[3] On January 9, 2008, defendant committed armed robbery of Son Nguyen.[4] Also on this date, defendant committed armed robbery and second degree kidnapping of Tiffany Stafford. All of these crimes took place in Jefferson Parish.
On appeal, defendant argues that the district court erred in the denial of the Motion to Suppress the Confession and the Identification. For the reasons stated herein, we affirm defendant’s convictions and sentences.

DISCUSSION

By this appeal, defendant argues that she was arrested without an arrest warrant and without probable cause when the officers arrived at her residence. She contends that her three statements and the identification she made were fruits of the illegal arrest and that there was not sufficient attenuation from the illegal arrest to render them admissible. As such, she concludes that the trial court erred in denying the motion to suppress statements and identification.
The State responds that the trial court did not abuse its discretion in denying defendant’s motions to suppress. It eon-tends that defendant voluntarily accompanied the officers to the bureau and was not unlawfully arrested. The State alternatively argues that even if defendant was unlawfully arrested, the statements were sufficiently attenuated from the detention and, therefore, were admissible.
Detectives David Mascaro and Brent Beavers of the Robbery Division of the Jefferson Parish Sheriffs Office testified at the suppression hearing. During an investigation, the detectives went to defendant’s residence after following a cell phone signal. Detective Beavers explained that Detective Bartee was at the Bureau |4giving them “directional locations.” Detective Beavers stated that the “entire squad” went to her residence, but later clarified that it was himself and two co-workers, John Carroll and Dave Mas-caro. He said that after arriving at the residence in unmarked vehicles, they identified themselves as law enforcement officials and showed defendant their credentials. They were not in uniform and were wearing shirts and ties. Detective Beavers stated that one of defendant’s brothers and her sister was there at the residence. Defendant was living in this residence with her parents. They determined she was 17 years old.
Detective Beavers explained that they talked to defendant and that she agreed to accompany them back to the Bureau. He testified that defendant voluntarily and freely went with them. When asked if defendant could have said she did not want to go with them and whether she could have chosen to stay home, Detective Beavers answered affirmatively. Detective Beavers was then asked, “Nothing else would have happened; she wouldn’t have been placed under arrest; you wouldn’t *491 have taken her into custody at all, correct?” Detective Beavers responded, “Not at that point, she was not under arrest.” Detective Beavers testified that she was “booked” later on in the afternoon after giving her statements.
Detective Mascaro testified that they wanted to speak to defendant and that defendant was told they wanted to speak to her in reference to an investigation. They picked defendant up from her residence. Detective Mascaro was asked if he told defendant she was under arrest when he took her into custody. Detective Mas-caro responded that she was not under arrest. He was then asked again if he told her she was under arrest, and Detective Mascaro responded “No, I didn’t, because she was not under arrest.” Further, the rights form reflected that she was under investigation. Detective Mascaro was asked, “Well, she wasn’t free to leave, | ¿was she?” Detective Mascaro responded, “We were doing an investigation. She could have walked away.”
Detective Mascaro was asked if he formally placed defendant under arrest on January 9th. He responded, “Once she began to make the statements in reference to her participation, yes, she was arrested. And that’s why she was upset because, to me, it appeared that she realized she made a mistake in committing the robberies.” Detective Mascaro was then asked, “Prior to going over that form with her on the 9th, had you placed her under arrest?” Detective Mascaro responded, “No.”
Defendant executed a Rights of Arres-tee or Suspects form on January 9, 2008 at 12:25. This form reflects that she was “UNDER INVESTIGATION” for armed robbery. Detective Mascaro completed this form with defendant. Thereafter, defendant gave taped statements at 1:42 p.m. and at 2:00 p.m. to Detective Mascaro.
Detective Mascaro testified that to the best of his knowledge, defendant understood the rights as explained, and that as he read them, she read along and initialed next to each right. Detective Mascaro and defendant both signed the form. Detective Mascaro testified that defendant was not promised anything or threatened to give a statement. Detective Mascaro identified a transcription of a taped statement that defendant gave him on January 9th regarding one of the armed robberies committed the night of January 8th.
In the first statement, defendant agreed that the detectives met with her at her house that morning and advised her they wére conducting an investigation in reference to an armed robbery involving a cell phone. Detective Mascaro asked, “Okay. And I believe you agreed to accompany us back here to answer questions Rand talk about if you knew about a phone[.] Is that correct?” Defendant responded, ‘Tes sir.”
Defendant agreed that they filled out a form and that she was advised of her rights on this form. She admitted that the form contained her initials and signatures, acknowledging that she read her rights, that she understood her rights, and that she was willing to make a statement.
In this statement, defendant said that she went for a ride in a gray-colored Malibu car with Tracey Smith the night before. She identified him in a photographic lineup. Defendant explained that they followed a white female to her house, then defendant got out of Smith’s car with a black bandana on her face and pulled out a gun. She stated that the gun belonged to Smith’s grandfather. Smith told the female to give him her money, and the female threw her purse. Defendant picked up the wallet from the purse and returned to the car. Smith told the female to get in the trunk of her car, and after Smith put her in the trunk he drove off in her car. *492 Smith drove down the street and wrecked the female’s car. Smith ran back to his car, and they left. Smith dropped defendant off at home. She believed he kept the wallet.
On this same date, defendant gave a second statement. At the beginning of the statement, she acknowledged that they had gone over a form in which she was advised of her rights prior to taking the first statement. She acknowledged again that the form contained her initials next to each of the rights and her signature, acknowledging that she had read and understood her rights and would give a statement. Defendant also agreed that after they went over her rights she admitted to committing a robbery with Smith. The subject of the second statement was another robbery committed with Smith just pri- or to the robbery of the female. Again, she identified Smith in a photographic lineup.
|7In this statement, defendant explained that they were in Smith’s car and had followed an “Asian” man. They passed up his house when he pulled into his driveway. Smith approached him with the gun, asking for his keys, and ordering him into the trunk. Defendant stated that Smith took everything in the car, including the man’s phone and wallet. She said that an “Asian girl” came outside and Smith told her to go back inside. After Smith took the things from the car, Smith returned to the. car with defendant and they left. The wallet had $30.00 in cash, which they used to get gas for Smith’s car. Smith kept the credit cards, and defendant kept the phone. She explained that the phone was in her room in a closet.
Defendant did not execute a separate waiver of rights form each time he took a statement from her. Detective Mascaro testified that he did not have any reason to question defendant’s understanding of the forms. When asked about defendant’s demeanor throughout the process, Detective Mascaro testified that she was “[cjoopera-tive but upset.” Detective Mascaro testified that defendant “was realizing that she was arrested by the time she was giving the statements.”
Detective Mascaro spoke with defendant on the following day as well. On January 10, 2008, defendant executed another Rights of Arrestee or Suspects form. This time, however, the form reflects that she was under arrest for armed robbery. Detective Mascaro identified the rights form completed with defendant on January 10th regarding an additional armed robbery. Detective Mascaro identified a transcribed copy of the statement he took from defendant regarding the armed robbery on January 1st of Lorrie Fisher in which her car was taken.
In defendant’s third taped statement, defendant acknowledged that she had agreed to come back to the office to talk to Detective Mascaro after meeting with him at the Correctional Center in Jefferson Parish. She also acknowledged filling |sout a form that advised her of her rights and that now she was under arrest and would be charged with armed robbery. She admitted that the form, contained her initials and her signatures, stating that she read her rights and wished to waive her rights and give a statement.
In this statement, defendant explained that about two weeks before, she, her younger sister, and Smith were in defendant’s car. According to defendant, Smith had a gun and was talking about stealing a car. She explained that a white female had just arrived home. Smith parked defendant’s ear around the corner from the female’s house and ran over. Defendant and her sister remained in the car. Smith “put the gun to her” and took the car. Smith told defendant that he told the fe *493 male to get her baby out of the car. Defendant said she got about $60.00. She believed her sister probably got about $60.00 too. Smith kept the rest of the money. When they went to defendant’s house, Smith parked the car on the next street, “[t]o duck it from the cops” she believed.
Detective Beavers testified that after defendant was developed as a suspect, Tracey Smith was subsequently developed as a suspect. According to Detective Beavers, he was not present when defendant made her statements, but did show her a photographic lineup containing Smith. She positively identified Smith from the lineup. Detective Beavers testified that he did not suggest to her who to pick and did not promise defendant anything for making the identification.
Defendant’s mother consented to a search of her residence at 3868 Birchfield Drive in Harvey, and no evidence was seized pursuant to that consent search.
Photographic lineups containing photographs of defendant and Tracey Smith were shown to the victims. Lorrie Fisher went back and forth between two photographs in the lineup containing Smith. She was not able to identify ^defendant. She said it was definitely a male that robbed her, and that she had seen only one suspect. Another victim, Tiffany Stafford, identified Tracey Smith, but was not able to identify anyone in the lineup that contained defendant. Son Nguyen was unable to identify anyone from the lineups.
Detective Beavers testified that they executed a search warrant at Tracey Smith’s residence and while searching the residence Smith arrived and was arrested. Detective Beavers testified that in a search incident to Smith’s arrest, the officers searched Smith’s back pocket and found credit cards, gift cards, and he believed an identification belonging to victim Tiffany Stafford. While waiting for the transport unit to take Smith to the bureau, the officers observed identification cards, social security cards, and “things of that nature,” by the storm drain in front of Smith’s residence. Victim Son Nguyen’s name was on the cards. No firearms were recovered pursuant to the execution of the search warrant of the residence. However, a firearm was subsequently recovered by Sergeant John Carroll after Smith’s grandfather voluntarily turned it over.
After hearing the testimony at the suppression hearing, the trial judge denied defendant’s suppression motions.
In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). The trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of its discretion. State v. Lee, 05-2098, p. 15 (La.1/16/08), 976 So.2d 109, 122, cert. denied, — U.S. -, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); State v. Haywood, 00-1584, p. 5 (La.App. 5 Cir. 3/28/01), 783 So.2d 568, 574.
|inThe Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. State v. Freeman, 97-1115, pp. 4-5 (La.App. 5 Cir. 12/29/98), 727 So.2d 630, 634. If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial. State v. Benjamin, 97-3065, p. 3 (La.12/1/98), 722 So.2d 988, 989; State v. Severin, 06-906, pp. 3-4 (La.App. 5 Cir. 4/11/07), 958 So.2d 21, 23. The exclusionary rule bars, as illegal fruit, physical and verbal evidence obtained either during or as a direct result *494 of an “unlawful invasion.” The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of illegality, or “ ‘fruit of the poisonous tree.’ ” State v. Nicholas, 06-903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 686-87. A defendant who is adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. LSA-C.Cr.P. art. 703(A).
Upon the defendant’s challenge to the admissibility of the confession, the State is required to establish either that the arrest was lawful, or if the arrest was unlawful, that the connection between the arrest and the confession was so attenuated that the confession could not possibly be considered fruit of the illegal arrest. State v. Brown, 445 So.2d 456, 459 (La.App. 5 Cir.1984) (citing Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).[5] Confessions obtained through custodial interrogations after an illegal arrest should be excluded from evidence unless intervening events break the causal connection between the | nillegal arrest and the confession so that the confession is “ ‘sufficiently an act of free will to purge the primary taint.’ ” State v. Arceneaux, 425 So.2d 740, 743 (La.1983) (quotations omitted). Statements made by a defendant during an allegedly illegal detention are inadmissible if they are the product of illegal detention and not the result of an independent act of free will. State v. Otero, 08-188 (La.App. 5 Cir. 12/16/08), 3 So.3d 34 (citing State v. Fisher, 97-1133, p. 11 (La.9/9/98), 720 So.2d 1179, 1185). The fact that the accused may have been properly informed of his constitutional rights and waived them, while relevant, does not alone break the causal link. Fisher, 97-1133 at 11, 720 So.2d at 1186.
 Before the State may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. State v. Blank, 04-0204, p. 9 (La.4/11/07), 955 So.2d 90, 103, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007); (citing La. R.S. 15:451; LSA-C.Cr.P. art. 703(D); State v. Simmons, 443 So.2d 512, 515 (La.1983)). Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[6] rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. State v. Franklin, 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04), 869 So.2d 817. On appeal, defendant does not challenge the voluntariness of her statements, but only argues her statements were the result of an illegal arrest.
*495 11{>Defendant argues that the statements and identification should have been suppressed as fruit of the illegal arrest. Defendant argues that multiple police officers went to her home while her parents were not present and had her accompany them to the detective bureau. Defendant argues that she was 17 years old at the time, and that any 17-year-old would reasonably believe that he or she was under arrest. Defendant admits that the testimony indicated that she was not told she was under arrest by the detectives at that time. She argues that she was never informed that she could decline to accompany them or that she could leave the police station.
Defendant also challenges an identification she made, not of herself, but of her co-defendant. She argues that after reviewing a photographic lineup, she positively identified her co-defendant as a participant in the charged offenses.
However, the record fads to show that the statements and identification defendant made were the products of an illegal arrest. Further, the record does not support a finding that defendant was arrested at the time the detectives arrived at her residence.
An arrest is the taking of one person into custody by another through actual restraint that may be imposed by force or that may result from submission of the person arrested to the custody of the one arresting him. LSA-C.Cr.P. art. 201. Whether a person has been arrested is determined by an objective test. Neither the person’s subjective impression nor the lack of formality of the arrest resolves the issue. Fisher, 97-1133 at 6, 720 So.2d 1179, 1183. The determination of whether an arrest occurred depends on the totality of the circumstances, but several factors distinguish an arrest from lesser infringements on personal liberty. Id.
A prime characteristic of any Fourth Amendment seizure of a person is whether, under the totality of the circumstances, a reasonable person would not | isconsider himself or herself free to leave. Fisher, 97-1133 at 6, 720 So.2d 1179, 1183. Ultimately, whether a person has been arrested depends on circumstances indicating an intent to impose an extended restraint on the person’s liberty. Id. (emphasis as found in original). “The circumstances indicating an intent to effect a restraint on the liberty of an accused, rather than the precise timing of the words “‘you are under arrest,’” determine when an arrest has been made.” State v. Hargrave, 411 So.2d 1058, 1060 (La.1982) (quotations omitted). This Court has recognized that the only relevant inquiry in the determination of whether there was a formal arrest or a restraint of freedom of movement to a degree associated with an arrest is how a reasonable man in the suspect’s position would have understood the situation. State v. Gant, 06-232, pp. 27-28 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1122, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599.
In State v. Blank, 04-0204 at 8, 955 So.2d at 102, two officers testified that they went to the defendant’s automotive store and that the defendant agreed to accompany them to the police station to answer questions. The officers testified that the defendant was free to leave before he confessed to the crimes. Id. In Blank, the defendant was not administered Miranda warnings at his place of business nor was he handcuffed while he traveled to the station in the front passenger seat of the police vehicle. Blank, 04-0204 at 8-9, 955 So.2d at 102. Further, at the outset of the interrogation, one of the detectives advised the defendant that he was not being placed under arrest, and the defen *496 dant responded that he was not “even worried about that.” Blank, 04-0204 at 9, 955 So.2d at 102.
In Blank, the Louisiana Supreme Court found that the defendant was not in custody when he voluntarily agreed to accompany the officers to the station. As such, the court concluded that the defendant failed to show that he was arrested on less than probable cause and that the subsequent statements should have been 114suppressed as fruits of an illegal detention. Blank, 04-0204 at 8-9, 955 So.2d at 102.
In State v. Allen, 95-1754, pp. 7-8 (La.9/5/96), 682 So.2d 713, 720, the Louisiana Supreme Court found that the defendant voluntarily accompanied the deputies to the substation. The court found that even assuming the defendant was transported by a patrol car to the station, there was no indication that the defendant was forced to go, and that there was no evidence suggesting the defendant was not free to terminate the interview at any time and leave. The court concluded there was no restraint on the defendant’s freedom.
In State v. Obney, 505 So.2d 211, 216-18 (La.App. 3 Cir.1987), writ denied, 508 So.2d 818 (La.1987), officers arrived at the defendant’s residence dressed in street clothes and driving unmarked cars. They knocked on the door and were invited in. No guns were drawn, no handcuffs were displayed, and no threatening statements or actions were made. The court recognized that the defendant voluntarily accompanied the police to the station house, and whether sincere or not, fostered the belief that he desired to assist the officers’ investigation. Even though the defendant was never expressly told that he did not have to accompany the officers to the station, the court found that the defendant was not under arrest at the time he gave a statement to the police at the station. The court found that the evidence did not indicate the defendant was coerced into traveling to the police station and that the defendant was not in custody or detained prior to giving a statement.
In the present case, the detectives went to defendant’s residence during their investigation of an armed robbery. Detective Mascaro testified that at the time they were speaking to defendant, they were not looking for a female suspect. The |isthree officers arrived at the residence in unmarked vehicles and were not in uniform.
Detective Beavers testified that defendant agreed to accompany them back to the Bureau, and went with them freely and voluntarily. He stated that defendant could have chosen not to go with them. In defendant’s own statement, she agreed that the detectives met with her at her house that morning and advised her they were conducting an investigation in reference to an armed robbery involving a cell phone. She also admitted that she agreed to accompany the detectives back to the bureau to answer questions and talk about any knowledge she had of the phone.
Detective Mascaro testified that defendant was told they wanted to speak to her in reference to an investigation. Although the record is unclear as to who transported defendant to the bureau, the record indicates that she rode in an unmarked police vehicle. When Detective Mascaro was asked if he picked defendant up from her residence, he responded, “Yes, I did.”
Detective Mascaro testified that defendant was under investigation and if she would have asked to leave she could have left, but stated that defendant had never asked to leave. He also said defendant was “completely cooperative.” Detective Mascaro explained that there were several reasons they could not continue to speak to defendant at her residence. He explained that they were conducting an investigation *497 regarding two armed robberies and that if she gave them information they could use in the case, they would have tools at their office that they needed. Detective Masca-ro testified that defendant was not told she was under arrest because she was not being arrested.
Further, as pointed out by Detective Mascaro, the first waiver of rights form reflected defendant was under investigation. The waiver of rights form executed |1fion the following day, however, reflected that she was under arrest for armed robbery.
Detective Mascaro testified that prior to the time that he went over the waiver of rights form, defendant was not arrested. He testified that defendant was arrested once she began to make the statements in reference to her participation in committing the robberies. Detective Beavers testified that she was not “booked” until later that afternoon after giving her statements.
Based on the foregoing, we find that defendant was not arrested when the officers arrived at her home and she accompanied them to the bureau. Defendant does not provide an independent basis to challenge her statements and her identification of Smith. Instead, she merely challenges them as fruit of an illegal arrest. Because we fail to find that defendant was illegally arrested, the identification and statements are not fruit of an illegal arrest. The first statement was not a product of an illegal arrest because defendant was not arrested from the moment the detectives arrived at her home, as is suggested by defendant. Further, during the first statement to the detective, defendant admitted her involvement in an armed robbery. After the first statement, we find there was probable cause to arrest defendant for the armed robbery.
Accordingly, for the reasons assigned herein, we find no abuse of the trial court’s discretion in denying the motions to suppress in this case. Defendant’s assignments of error are without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Welland, 556 So.2d 175 (La.App. 5 Cir.1990). We find no errors which required corrective action.
Defendant’s conviction and sentence are hereby affirmed.

AFFIRMED.

WINSBERG, J., Pro Tempore Concurs.

. Tracey Smith was also charged with these same offenses in this bill of information.

. State v. Crosby, 338 So.2d 584 (La.1976).

. It is noted that Fisher’s first name is also spelled "Laurie” in the record.

. It is noted that this victim was also referred to as "Sun Nygen” in the record.

. In Brown v. Illinois, the United States Supreme Court enunciated the multi-factor test used to consider whether evidence impermis-sibly seized should be suppressed. State v. Hill, 97-2551, p. 3 (La.11/6/98), 725 So.2d 1282, 1284. The primary considerations under Brown are: (1) the temporal proximity of the illegality and the acquisition of the evidence to which instant objection is made; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at 603-04, 95 S.Ct. at 2261-62; Hill, 97-2551 at 3-4, 725 So.2d at 1284.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).